AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original    ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

FILED
CLERK, U.S. DISTRICT COURT

3/5/2025

CENTRAL DISTRICT OF CALIFORNIA
BY: ____bm____ DEPUTY

| | |
|---|---|
| United States of America | |
| v. | Case No. 2:25-MJ-01179 |
| Zajah PHILLIPS | |
| Defendant. | |

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, Susanna Espinoza, the complainant in this case, state that the following is true to the best of my knowledge and belief. On or about the date of March 3, 2025, in the County of Los Angeles in the Central District of California, the defendant violated:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. § 841(a)(1) | Possession with Intent to Distribute a Controlled Substance |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
/s/
*Complainant's signature*

Susanna Espinoza, Special Agent, HSI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:    3/5/2025

_____
*Judge's signature*

City and state:    Los Angeles, California

Hon. , Jean P. Rosenbluth, U.S. Magistrate Judge
*Printed name and title*

AUSA: Clifford Mpare (x4962)

## AFFIDAVIT

I, Susanna M. Espinoza, being duly sworn, declare and state as follows:

## I.   PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of a criminal complaint against and arrest warrant for Zajah PHILLIPS ("PHILLIPS"), for violating Title 21, U.S.C. § 841(a)(1): possession with intent to distribute a controlled substance.

2.    This affidavit is also made in support of an application for a warrant to search the following digital devices (the "SUBJECT DEVICES") seized from PHILLIPS's belongings and currently in the custody of Homeland Security Investigations ("HSI") in El Segundo, California, and described more fully in Attachment A:

      a.    a red Apple iPhone ("SUBJECT DEVICE 1");

      b.    a space-grey Apple iPhone with a cracked and broken backing and one shattered camera lens ("SUBJECT DEVICE 2").

3.    The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances), 21 U.S.C. § 846 (conspiracy to distribute controlled substances); and 21 U.S.C. §§ 953, 960 (unlawful exportation of controlled substances), (the "Subject Offenses"), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

4.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel, witnesses, and databases.  This affidavit written in good faith and is intended to show that there is sufficient probable cause for the requested complaint and warrants and does not purport to set forth all my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

5.    I am a Special Agent with HSI within the United States Department of Homeland Security ("DHS") and have been so employed since May of 2024.  Currently, I am assigned to the HSI Office of the Special Agent in Charge in Los Angeles, California.

6.    I am a sworn "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(c), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.  In the course of my work, I have conducted physical surveillance and reviewed electronic records.

7.    Prior to tenure as a Special Agent, I served in the United States Navy in an Active-Duty status aboard the aircraft carrier USS Dwight D. Eisenhower.  During that time, I served for one year as a military law enforcement officer for the In-Port Security Forces Division.  While serving in this capacity,

2

I worked alongside the crew's Master-At-Arms enforcing the United States Code of Military Justice onboard.

8.    I am a graduate of the University of California – Riverside having successfully obtained a Bachelor of Arts degree in Liberal Studies.  Furthermore, I am also a graduate of Criminal Investigator Training Program and, subsequently, the Homeland Security Investigations Special Agent Training Academy held at the Federal Law Enforcement Training Center in Glynco, Georgia.  During the approximately six-month program, I completed academic and practical courses covering criminal investigative functions as well as criminal law, immigration law, and customs law.

### III.  SUMMARY OF PROBABLE CAUSE

9.    On March 3, 2025, I was notified by United States Customs and Border Protection ("CBP") of a passenger, later identified as PHILLIPS, attempting to smuggle hashish out of Los Angeles International Airport ("LAX") on an outbound flight to Sao Paulo, Brazil.  Upon inspection, PHILLIPS was found in possession of approximately 39.60 kilograms of hashish located in two checked bags she ultimately claimed belonged to her.

### IV. STATEMENT OF PROBABLE CAUSE

10.  Based on my involvement in this investigation, my conversations with other law enforcement officials involved in this investigation, my review of photos, reports and records connected to this investigation, as well as interviews conducted, I am aware of the following:

3

**A.    CBP Officers Discover Hashish in PHILLIPS' Checked Baggage**

11.    Prior to PHILLIPS's arrival at LAX, a seizure report written by a CBPO who participated in the PHILLIPS Seizure on March 3, 2025 stated CBP selected PHILLIPS for an additional luggage inspection based on a CBP analysis of current drug smuggling travel patterns matching previous marijuana seizures at LAX.  On the afternoon of March 3, 2025, PHILLIPS arrived at LAX and checked in for her Latam Airlines flight to Sao Paulo with her boyfriend, Anthony GEORGE.  As part of the check-in process, PHILLIPS and GEORGE checked three bags, two of which bore the following tag numbers: LA790685 and LA790687.  CBP Officers ("CBPOs") searched one of the checked bags and discovered multiple vacuum-sealed, plastic packages containing a paste-like substance matching the known characteristics for Hashish.

12.    Shortly thereafter, the aforementioned seizure report stated CBPOs encountered PHILLIPS and GEORGE attempting to board their flight to Sao Paulo at Gate 132 of the Tom Bradley International Terminal ("TBIT").  PHILLIPS and GEORGE were removed from the boarding line, detained, and escorted to the secondary baggage inspection.  Given the initial discovery of suspected hashish from one of the bags, CBPOs asked PHILLIPS and GEORGE to accompany them to a separate screening area inside TBIT, and both PHILLIPS and GEORGE complied.

13.    The CBPO report documented that CBPO Carbajal, who participated in the examination, obtained a verbal binding declaration of ownership from PHILLIPS regarding the checked

4

luggage.  Despite GEORGE's printed name appearing on the baggage tag affixed to a cream-and-brown checked bag containing suspected Hashish and women's clothing, PHILLIPS told the CBPO that the checked bag, which bore the tag number LA790685, and the contents contained within them, belonged to her.  PHILLIPS then proceeded to give a second verbal binding declaration to CBPOs claiming ownership of the bags bearing tag numbers LA790685 and LA790687.  PHILLIPS claimed that the airline staff put the cream-and-brown checked bag under GEORGE's name by mistake since both she and GEORGE's name were on the travel tickets.

14.  During CBPO Carbajal's examination of PHILLIPS, PHILLIPS stated both bags were hers but were given to her by a male individual who reached out to her via Facebook. PHILLIPS told CBPOs the male claimed he could pay her $10,000-$15,000 if PHILLIPS transported the bags to Brazil. When CBPOs asked PHILLIPS if she knew what the bags contained, she responded by stating she did not know nor did she care as long as she was getting paid for it.

15.  Secondary baggage inspections conducted on PHILLIPS' checked baggage revealed a total of 36 vacuum-sealed packages containing what CBPOs described as "a green, pasty substance."

16.  Contents from one of the vacuum-sealed packages was tested by CBPOs using the NIK Kit 908 for Hashish/Marijuana. The test returned a presumptively positive result for the presence of marijuana properties inside the package. Additionally, a CBPO weighed all 36 the vacuum-sealed packages

found inside both pieces of luggage and determined they collectively weighed approximately 39.6 kilograms.

17.   Images depicting the Latam Baggage Tags bearing the tag numbers of LA790685, LA790687, the names of PHILLIPS and GEORGE, and the discovered narcotics are attached below:

 





### B.    CBPO INSPECTION of PHILLIPS

18.    A personal search and inspection of PHILLIPS was approved by the duty Supervisory CBPO ("SCBPO").  Two female CBPOs were instructed to conduct the personal search. Below is a summary of the encounter with PHILLIPS via the statements written by the on-duty CBPOs:

a.    According to a statement written by CBPO Soriano, the authorized search she conducted alongside CBPO Villalba-Lopez concluded with negative results.  However, during this personal search and inspection of PHILLIPS, CBPOs discovered two cell phones in PHILLIPS's carry-on baggage, which she had brought to the airport.  These phones, described more fully in Attachment A, included one red Apple iPhone and one space-grey Apple iPhone with a cracked and broken backing and one shattered camera lens.

7

Given the location of the phones, CBPOs believed both phones belonged to PHILLIPS.

b.    Afterwards, PHILLIPS was escorted to the waiting area while the other CBPOs processed the narcotics seizure.

i.    CBPO Soriano wrote that that whilst in the waiting area, PHILLIPS asked, "Where is Homeland Security?"  To which, CBPO Soriano replied that she and CBPO Villalba-Lopez were Homeland Security." PHILLIPS then remarked, "No.  Your patch says 'Police: Customs and Border Protection.'  I'm talking about Homeland Security.  I need them to hurry up and ask me the questions so I can go home."

c.    In another report written by CBPO Villalba-Lopez, the CBPO noted that following the conclusion of the personal search she conducted with CBPO Soriano, PHILLIPS began voluntarily asking questions regarding how much longer she would be waiting.

i.    CBPO Villalba-Lopez stated that she informed PHILLIPS that she was not sure how much longer PHILLIPS would be waiting.  In response, CBPO Villalba-Lopez noted that PHILLIPS stated "Who am I waiting for, HSI?  They are only going to speak to me and let me go!  So, what's taking so long?"  CBPO Villalba-Lopez then asked PHILLIPS how she knew that.  PHILLIPS answered, "They told me!"

ii.    Later in her report, CBPO Villalba-Lopez noted that whilst conducting welfare checks, PHILLIPS began initiating conversation on her own with CBPO Soriano and CBPO Villalba-Lopez.  In particular, CBPO Villalba-Lopez recalled that

8

PHILLIPS stated, "I only did this to make extra money.  The degree I have doesn't bring me money- I'm not making money in anything I love doing."  When asked by the CBPOs what her degree was in, PHILLIPS responded, "African studies, so I only did this because they told me I would get a free trip, take someone else included, and I would make mile points for my Delta flights on top of the $10,000 to $20,000 they were going to pay me." PHILLIPS reportedly also remarked that she "just did this because they contacted her from Facebook" and "texting applications for the extra money."

   iii.  CBPO Villalba-Lopez also remarked that PHILLIPS remained very insistent that the processing procedures conclude quickly, asking the CBPOs, "Can I be done before 7 p.m. so that I can go back to the ticket counter and rebook a flight to retrieve my points?"

**C.   HSI INTERVIEW of GEORGE**

19.  SA Callahan and I arrived at the CBP Secondary Inspection Area at TBIT in LAX to interview GEORGE.

20.  At the onset of the interview, after introductions and providing credentials for GEORGE's inspection, I provided GEORGE a paper copy of the Miranda Waiver form and subsequently read him his rights in the English language. GEORGE elected to voluntarily waive his Miranda Rights and speak with myself and SA Callahan.

21.  During the interview, GEORGE maintained that he possessed no knowledge of the contents within the checked baggage containing the Hashish.  He also indicated that a

9

misunderstanding at the check-in/ticket counter resulted in his name being placed on PHILLIPS' baggage tag, as he only assisted PHILLIPS with placing the baggage on the scale.

22.   SA Callahan and I asked for consent to search the cellular device found on GEORGE's person, but he declined to give consent.

23.   After the interview with GEORGE was terminated GEORGE was released.

## D.   HSI INTERVIEW of PHILLIPS

24.   At the onset of the interview with PHILLIPS, I advised PHILLIPS of her Miranda rights and provided her a physical copy of the Miranda Waiver Form.  PHILLIPS said she understood those rights, declined to be interviewed, and invoked her Fifth Amendment Rights by requesting a lawyer.

25.   Subsequently, SA Callahan and I terminated the interview with PHILLIPS.

## V.   TRAINING AND EXPERIENCES ON DRUG OFFENSES

26.   Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.   Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their

illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b.   Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

c.   Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

d.   Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

11

## VI. <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>[1]

17.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.  Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remains on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.  Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable

---

[1] As used herein, the term "digital device" includes SUBJECT DEVICES.

12

data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

18.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which

13

may take substantial time, particularly as to the categories of electronic evidence referenced above.

b.    Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

19.    The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.    Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.    In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the

14

opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the SUBJECT DEVICES.

c.    The person who is in possession of a device or has the device among his or her belongings is likely a user of the device.  Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress PHILLIPS' thumb and/or fingers on the SUBJECT DEVICES; and (2) hold the SUBJECT DEVICES in front of PHILLIPS' face with her eyes open to activate the facial-, iris, and/or retina-recognition feature.

27.    Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. CONCLUSION

28.  For all the reasons described above, I submit that there is probable cause to believe that PHILLIPS has committed violations of Title 21, U.S.C. § 841(a)(1) (possession with intent to distribute a controlled substance), 21 U.S.C. § 846 (conspiracy to distribute controlled substances); and 21 U.S.C. §§ 953, 960 (unlawful exportation of controlled substances).   I further submit that there is probable cause to believe that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICES described in Attachment A.

15

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this  5th   day of
March 2025.

HON.  JEAN P. ROSENBLUTH
UNITED STATES MAGISTRATE JUDGE

16